**UNITED STATES of America, Plaintiff,**

v.

**Richard WEINSTEIN, Defendant.**

**CR No. 92–10341–T.**

United States District Court,
D. Massachusetts.

Aug. 5, 1993.

---

**4**

MaryEllen Kelleher, Law Office of Richard Egbert, Boston, MA, for defendant.

Fred M. Wyshak, Jr., U.S. Atty.'s Office, Boston, MA, for U.S.

## ORDER

TAURO, Chief Judge.

For the reasons stated in the accompanying Sentencing Memorandum, the court hereby commits defendant Weinstein to the custody of the Bureau of Prisons for a period of twelve months. Upon release, defendant Weinstein shall be placed on supervised release for a term of three years. The court also imposes a $200 special assessment.

Copies of this Order and the accompanying Sentencing Memorandum shall be issued to all counsel of record, the Probation Office, the United States Marshal, and the United States Sentencing Commission.

IT IS SO ORDERED.

## SENTENCING MEMORANDUM

Defendant Richard Weinstein appeared before this court today after having pled guilty to violations of 18 U.S.C. § 371 (conspiracy to launder monetary instruments), 18 U.S.C. § 1956(a)(1)(B)(i), (ii) (laundering of monetary instruments), 31 U.S.C. § 5324 (structuring transactions to evade reporting requirements), and 18 U.S.C. § 1957 (engaging in monetary transactions in property derived from specified unlawful conduct). For the reasons set forth more fully below, the court sentenced Weinstein to twelve months incarceration to be followed by three years of supervised release, and required him to pay a special assessment of $200, pursuant to 18 U.S.C. § 3013.

## I.

### Background

Presentence filings establish that in October of 1988, Weinstein obtained nine betting checks from an unindicted individual named Elliot Mael, and caused those checks to be delivered to another individual named James Katz. The checks were never negotiated by Weinstein.

The sentencing guidelines for the specific money laundering offenses to which Weinstein pled guilty are found at U.S.S.G. §§ 2S1.1–.3. The Probation Office determined that § 2S1.1 is applicable to this case, and used that provision to calculate Weinstein's Adjusted Offense Level, pursuant to U.S.S.G. § 3D1.3(b). The government suggests that after a 3–level reduction for Weinstein's acceptance of responsibility, as well as an additional 2–level reduction for his mitigating role in the overall conspiracy, the applicable offense level is 15, corresponding to a sentencing range of twenty-one to twenty-seven months. Had Weinstein pled guilty only to bookmaking, his base offense level would have been level 12, with a sentencing range of twelve to eighteen months. *See* U.S.S.G. §§ 2E3.1–.2.

## II.

### Departure

Relying on the First Circuit's directive in *United States v. Rivera*, 994 F.2d 942 (1st Cir.1993), this court, in *United States v. LeBlanc*, 825 F.Supp. 422, 423–24 (1993), departed from the guidelines and based the sentence in that case only upon the defen-

dant's underlying conduct of gambling, rather than upon the money laundering charges to which he had "technically" pled guilty. The present case warrants almost identical considerations. Weinstein took checks from a bettor who was placing bets with him and subsequently turned those checks over to others to be negotiated.

The Court of Appeals for the Tenth Circuit has suggested that the money laundering statute applies only "to monetary transactions occurring after the completion of the underlying criminal activity." *United States v. Johnson,* 971 F.2d 562, 568–69 (10th Cir. 1992) (citing *United States v. Edgmon,* 952 F.2d 1206 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3037, 120 L.Ed.2d 906 (1992); *United States v. Lovett,* 964 F.2d 1029 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 169, 121 L.Ed.2d 117 (1992)). In *Edgmon* and *Lovett,* the court concluded that the money laundering transactions constituted offenses separate from the underlying criminal activity that generated the money. *Johnson,* 971 F.2d at 569. The following excerpt from the *Edgmon* opinion is particularly instructive:

> The [S]enate report on § 1956 expresses the need for a federal criminal offense aimed directly at the activity of laundering the money gained from illegal activity. The Senate report on the money laundering bill makes plain that the bill was intended to create a "new Federal offense against money laundering." Sen.R. 99–433 at 4. The discussion throughout the report is of the gap in the criminal law with respect to the post-crime hiding of the illgotten gains....
>
> ....
>
> ... Congress aimed the crime of money laundering at conduct that follows in time the underlying crime rather than to afford an alternative means of punishing the prior "specified unlawful activity." Congress enacted the money laundering statute to provide a punishment in addition to other punishment rather than instead of other punishment.

*Edgmon,* 952 F.2d at 1213–14.

In this case, the money laundering statute is not used as an additional means of punishing the underlying crime of gambling. Rather, it is used as "an alternative means of punishing the prior 'specified unlawful activity.'" *Id.* at 1214. This court cannot conceive of a manner in which gambling operations can be conducted without the exchange of money. The court also notes that the typical money laundering case involves some attempt to hide the source of the money. *See Edgmon,* 952 F.2d at 1213. Simply obtaining checks, the conduct at issue here, does not support a conclusion that there was any attempt to hide the source of the funds. While the money laundering statutes may technically prohibit a broad range of conduct, the "classic" scenario still remains that of a criminal who,

> collects large amounts of cash from [illegal activity] and, acting with the complicity of a banker or other person in a financial institution, deposits the [illegal] proceeds in a bank under the guise of conducting a legitimate business transaction. The [money laundering statutes] appear[] to be part of an effort to criminalize the conduct of those third persons ... who have aided [criminals] by allowing them to dispose of the profits of [illegal] activity, yet whose conduct has not been considered criminal under traditional conspiracy law.

*Johnson,* 971 F.2d at 568–69.

Here, Weinstein obtained checks involved with a gambling business, which checks were eventually cashed. No attempt was made to "legitimize" the proceeds or to conceal their source. Accordingly, although Weinstein's activities may linguistically fall within the ambit of the money laundering guidelines, his conduct remains outside the "heartland" of a typical money laundering case. "While [Weinstein's] conduct may technically constitute money laundering—an offense to which he has pled guilty— ... the strictures of the money laundering statute would present an inequity not adequately taken into consideration by the Sentencing Commission." *LeBlanc,* 825 F.Supp. at 423–24. Accordingly, this court finds that a 3–level downward departure is warranted, resulting in an offense level of 12.

### III.

*Conclusion*

For the foregoing reasons, this court departs downward an additional 3 levels. Since defendant Weinstein's criminal category is II, a twelve-month sentence appropriately falls within the twelve- to eighteen-month permissible sentencing range corresponding to a level 12 offense.

An Order will issue.